UNITED STATES v. MACKEY et al.

(District Court, E. D. Oklahoma. June 2, 1913.)

No. 1733.

1. INDIANS (§ 27*)—LANDS—SUIT TO ENJOIN TRESPASS—JURISDICTION.

A suit to enjoin defendants from taking oil and gas without right from lands alleged to be the property of an Indian tribe and to be chiefly valuable for such minerals is cognizable in equity, and may be maintained by the United States.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.*]

2. NAVIGABLE WATERS (§ 1*)—NAVIGABILITY OF STREAM—ARKANSAS RIVER.

The Arkansas river is a navigable stream so far as concerns the question of title to the bed thereof.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–16; Dec. Dig. § 1.*]

3. NAVIGABLE WATERS (§ 37*)—TITLE TO BED OF STREAM—EFFECT OF GRANT TO INDIAN NATION.

The grant by the United States to the Creek tribe of Indians, pursuant to treaty, of lands in the Indian Territory by patent of August 11, 1852, did not vest in such tribe any right or title to the bed of the Arkansas river within the grant, between high-water marks, but the same continued to be held by the United States in trust for the future state, and on the admission of Oklahoma, passed to that state, subject to whatever rights, if any, the local state law, statutory or common, gave to owners of the land bordering on the stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*)—TITLE TO BED OF STREAM—PATENT TO INDIAN ALLOTTEE.

Under a patent to an Indian allottee of lands bordering on a meandered navigable stream, the boundary is not the meander line, but the title of the grantee extends to actual high-water mark of the stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

5. NAVIGABLE WATERS (§ 36*)—TITLE TO BED OF STREAM—VALIDITY OF TERRITORIAL STATUTES—CONTRAVENTION OF ORGANIC ACT.

In view of the settled and consistent policy of Congress of leaving to each state when organized the disposition of rights in the beds of navigable streams below high-water mark, the provision of the Organic Act of the Territory of Oklahoma that the legislative power of the territory should extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States did not authorize the territorial Legislature to pass a general act granting to riparian owners on navigable streams title to the bed of the stream to low-water mark, which was not a rightful subject of territorial legislation, and such an act was void and did not become a law of the state under Schedule, § 2, of its Constitution extending laws in force in the territory at the time of admission until altered or repealed.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

6. NAVIGABLE WATERS (§ 36*)—TITLE TO BED OF STREAM—COMMON LAW OF OKLAHOMA.

Under Wilson's Rev. & Ann. St. Okl. 1903, § 4200, providing that the common law, as modified by constitutional and statutory law, judicial decisions, "and the condition and wants of the people," shall remain in

force in aid of the general statutes, which provision, being in force in the territory at the time of its admission as a state, became a law of the state, the common law of the state with respect to the rights of riparian owners on navigable streams in the beds of such streams is not the strict common law of England which recognized only tidal streams as navigable, but such law as modified by the decisions of a large number of American courts, with the approval of the Supreme Court of the United States, by which all streams are to be classed as navigable which are in fact so, and as to all such streams the rule is applied that a riparian proprietor owns only to high-water mark.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

7. COURTS (§ 278*)—JURISDICTION OF FEDERAL COURTS—JURISDICTION OF ENTIRE CONTROVERSY.

Where the jurisdiction of a federal court has been properly invoked, it continues for the purpose of determining rights in property which is the subject of litigation under a cross-bill between codefendants, although the original bill is dismissed and there is no diversity of citizenship between the defendants.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 819; Dec. Dig. § 278.*]

In Equity. Suit by the United States against Phillip Mackey and others. On demurrers to bill and to a cross-bill between codefendants. Demurrer to bill sustained, and demurrer to cross-bill overruled.

Wm. J. Gregg, of Tulsa, Okl., and J. C. Denton, of Muskogee, Okl., for the United States.

Brown & Stewart, of Muskogee, Okl., for defendants Mackey.

Martin, Bush & Murray, of Tulsa, Okl., and Campbell & Beall, of Muskogee, Okl., for defendants Avery and Waterside Oil & Gas Co.

Burwell, Crocket & Johnson and Ledbetter, Stuart & Bell, all of Oklahoma City, Okl., for defendant Pollard-Hagan Oil Co.

F. B. Dillard, of Tulsa, Okl., for Texas Co.

James B. Diggs and Henry McGraw, both of Tulsa, Okl., for defendants Gladys Belle Oil Co., Gipsy Oil Co., and Stunkard.

James H. Chambers, of Oklahoma City, Okl., for intervener State of Oklahoma.

CAMPBELL, District Judge. Louisa Mackey in her lifetime was a freedman citizen of the Creek tribe of Indians, and there was selected by her as a portion of her allotment of the lands of said tribe and allotted by patent to her lots 1, 5, and 6 of the northeast quarter of section 18, township 18 north, range 13 east. Her patents were dated November 10, 1903, approved by the Secretary of the Interior January 8, 1904, and thereupon delivered to her before her death. Upon her death she left as her sole heirs at law Lovely Mackey, her husband, and Mary and Phillip Mackey, her two minor children. Lovely Mackey was duly and regularly appointed guardian of the persons and estates of the said minors, and on June 23, 1910, acting for himself and as guardian for said minors, executed an oil and gas mining lease to one Eysenbach, covering the land above described together with other lands, which by a subsequent series of assignments the defendants Gladys Belle Oil Company, Gypsy Oil Company, Charles Stunkard, and Walter Stun-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

kard now claim. In the lease above referred to, the said lots are described as "lots 1, 5, and 6, section 18 north, range 13 east," and they together with other tracts covered by the lease are recited as containing 142 acres, more or less. The lots mentioned are fractional portions of said section, lying along the north bank of the Arkansas river, a meandered stream; the meandered line appearing upon the plat as forming one of the boundaries of each of said lots. In November, 1911, the defendant Lovely Mackey, for himself and as guardian for said minors, executed an instrument purporting to be an oil and gas mining lease to Cyrus S. Avery, one of the defendants, covering the land lying between the meandered line of the Arkansas river as it forms the boundary of the several lots above mentioned and low-water mark of said river; the amount of land being recited as 40 acres, more or less.

It appears that at the institution of this suit, the Gladys Belle Oil Company, claiming under said Eysenbach, and the Waterside Oil Company, claiming under Avery, were engaged in a struggle for the possession of so much of this land as lies between the meandered line and low-water mark of the river; each having acquired actual possession of a portion of said tract and sunk wells thereon. This suit was instituted by the United States, on behalf of the Creek Nation, to enjoin these companies from trespassing upon and mining oil and gas from this land between the meandered line and low-water mark of the river. The theory of the government is that the ownership of the bed of the Arkansas river passed to the Creek Nation by the general grant of lands made to it in the patent executed by the government to the Creek Nation dated August 11, 1852, conveying to that nation the tribal lands which the Creeks have since occupied in what is now Eastern Oklahoma, the Arkansas river having been included within the boundaries of that grant; that inasmuch as in the survey of this land preparatory to allotment the Arkansas river was meandered and the land on each side, not including the river, was surveyed into sections and subdivisions thereof, the allottees of such of these subdivisions as are bounded by the river only took by their patents the land within the particular subdivisions described in the patents, or at most only took to high-water mark on the river; that the title to the river bed still remains in the Creek Nation; and that therefore the defendants who are, as the bill alleges, in possession of this land, taking the oil and gas therefrom, are trespassers upon the rights of the Creek Nation in these lands, and by removing the oil and gas therefrom are irreparably injuring the Nation in its property rights in the river bed.

To this bill the Gypsy Oil Company and the other defendants united in interest with it filed their answer and cross-complaint. In the answer they deny that the land in controversy is unallotted land of the Creek Nation, or that that tribe of Indians has any interest whatever in said land, but assert that the same passed to Louisa Mackey by her patent from the Creek Nation. They admit that the land lies between the meandered line and low-water mark of the river, but contend that it passed to Louisa Mackey by virtue of her patent by right of her riparian ownership to the exclusion of the Creek Nation and the United States. They allege that on November 15, 1911, they went into pos-

session of this land under an assignment of the lease of Eysenbach, above referred to, and have developed and are developing the property; they pray that the same be dismissed.

There is also filed by the Gypsy Oil Company and those united in interest with it a cross-complaint against the defendants, Cyrus S. Avery, Waterside Oil & Gas Company, and Pollard-Hagan Oil Company, in which it is sought to have the court decree that the said Gypsy Oil Company and those united in interest with it have a valid and subsisting oil and gas mining lease and leasehold estate in and to the said premises, with the sole and exclusive right to develop the property and take oil and gas therefrom, and that their title thereto be quieted as against the said Avery, Pollard-Hagan Oil Company, and the Waterside Oil Company, and that the latter be enjoined from asserting any superior rights thereto, and that it have judgment against Avery, the Waterside Oil & Gas Company, and the Texas Company for the value of oil taken from the premises by them.

The Pollard-Hagan Oil Company was by an amendment to the bill made party defendant, and has entered its appearance. The claim of this company is based upon a lease from the state of Oklahoma, and its contention is that, upon the advent of statehood, the title to the bed of the Arkansas river between high-water marks vested in the state, and that by virtue of its lease from the state it is entitled to the possession of the land in controversy for oil and gas mining purposes.

The several parties defendant have filed demurrers to the bill, and the cross-defendants have filed demurrers to the cross-bill. These demurrers were filed before the taking effect of the present equity rules, and will be treated now as motions to dismiss.

The main questions raised are the following:

First. Is the Arkansas river at the point in question a navigable stream?

Second. If it is a navigable stream, did the grant to the Creek Nation by the patent of August 11, 1852, convey to that nation the same title and interest in the bed of the Arkansas river as it acquired thereby to all the lands included within the grant not the beds of navigable streams.

Third. If the Creek Nation acquired the same title to the bed of the Arkansas river between high-water marks that it acquired to all the uplands covered by the patent, did the allotment deed of Louisa Mackey convey from the Creek Nation to her that nation's title in and to the land in controversy.

Fourth. If the title to the bed of the river did not pass to the Creek Nation by the patent from the United States, but remained in the United States in trust for the future state of Oklahoma, then, upon the advent of statehood, what were the rights of Louisa Mackey or her heirs as riparian owners of the upland bordering upon the river? Did their rights as such riparian owners of the soil extend to high-water mark, to low-water mark, or to the middle thread of the stream?

Fifth. If the rights of Louisa Mackey and her heirs as riparian owners of the soil extend to or beyond low-water mark, then the question arises: Did her lease to Eysenbach, under which the Gypsy Oil

Company claims and which was prior in point of time to the Avery lease under which the Waterside Oil Company claims, vest in Eysenbach and his assigns the right to enter for oil and gas mining purposes upon that portion of her land between high and low water marks?

[1] For the purpose of determining the questions raised by the several demurrers, the allegations of the bill and cross-bill are taken as true. If the theory of the government is sound that the title to the bed of the Arkansas river, including the land in controversy, is in the Creek Nation, there can be no question of the capacity of the United States to maintain the suit in behalf of the Creek Nation, if it be one cognizable in equity. From the bill it appears that the defendants, or at least a part of them, have taken possession of the property and sunk oil wells thereon, and are taking large quantities of oil and gas therefrom; and that they threaten to and will continue to do so, to the permanent and irreparable injury of the land, inasmuch as it is alleged that the chief value of the land is the oil and gas thereunder. Against this the bill prays an injunction as well as other relief. This states a cause of action cognizable in equity. Big Six Development Co. v. Mitchell, 138 Fed. 279, 70 C. C. A. 569, 1 L. R. A. (N. S.) 332; 5 Pomeroy's Equity Jurisprudence, § 495.

[2] I. Is the Arkansas river a navigable stream so far as concerns the question of title to the bed thereof? That it is was practically conceded at the oral argument. This question was answered in the affirmative by the Supreme Court of Kansas in the case of Dana v. Hurst, 86 Kan. 947, 122 Pac. 1041, decided last February, for reasons which appear to me to be sound, set forth in a well-considered opinion. We therefore start with the proposition that the Arkansas river is a navigable stream.

[3] II. Did the grant to the Creek Nation by the patent of August 11, 1852, convey to that nation the same title and interest in the bed of the Arkansas river as it acquired by the patent in the uplands covered by the patent?

The land conveyed by this patent was a part of the "Louisiana Purchase." By article 3 of the Treaty between the United States and France, concluded April 30, 1803 (see 8 Stat. p. 202), under the terms of which the lands comprising the Louisiana Purchase were acquired by the United States, it was was provided that:

"The inhabitants of the ceded territory shall be incorporated into the Union of the United States, and admitted as soon as possible according to the principles of the Federal Constitution."

By the Act of May 18, 1796, c. 29, § 9, 1 Stat. 468, now section 2476 of the Revised Statutes (U. S. Comp. St. 1901, p. 1567), it was provided:

"All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed to be highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both."

By the Act of March 3, 1811, c. 46, § 12, 2 Stat. 606, now section 5251, Revised Statutes (U. S. Comp. St. 1901, p. 3522), it was provided:

"All the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways."

In Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565, it is said:

"We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new states were formed, except for temporary purposes, and to execute the trusts created by the acts of the Virginia and Georgia Legislatures, and the deeds of cession executed by them to the United States, and the trust created by the treaty with the French Republic of the 30th of April, 1803, ceding Louisiana."

In Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798, it is said of the title to the bed of San Francisco Bay:

"Although the title to the soil under the tidewaters of the bay was acquired by the United States by cession from Mexico, equally with the title to the upland, they held it only in trust for the future state. Upon the admission of California into the Union upon equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government."

In Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224, referring to accretions, it is said:

"By the common law, as before remarked, such additions to the land on navigable waters belong to the crown. But, as the only waters recognized in England as navigable were tidewaters, the rule was often expressed as applicable to tidewaters, only, although the reason of the rule would equally apply to navigable waters above the flow of the tide; that reason being that the public authorities ought to have entire control of the great passageways of commerce and navigation, to be exercised for the public advantage and convenience. The confusion of navigable with tidewaters, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British Islands, and that of the American Continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters above tidewater at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several states themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject, the correct principles were laid down in Martin v. Waddell, 14 Pet. 367 [10 L. Ed. 997], Pollard v. Hagan, 3 How. 212 [11 L. Ed. 565], and Goodtitle v. Kibbe, 9 How. 471 [13 L. Ed. 220]. These cases related to tidewater, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of Genesee Chief, 12 How. 443 [13 L. Ed. 1058], has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the states by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the states in which the lands were situated."

In the case of Donnelly v. United States, 228 U. S. 243, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710, decided April 7, 1913, the Supreme Court of the United States had before it the question as to whether the Klamath river in California was a navigable stream, as bearing upon the question whether its bed was a part. of the Hoopa Valley Indian Reservation. It was decided, for reasons stated in the opinion, that the river was a non-navigable stream; but in the course of the opinion it was said:

"In passing upon the effect of the act admitting Alabama into the Union, this court held, in Pollard's Lessee v. Hagan, 3 How. 212 [11 L. Ed. 565], that the state had the same rights, sovereignty, and jurisdiction over the navigable waters as the original states, and could exercise all the powers of government which belong to and may be exercised by them, excepting with respect to control over public lands owned by the United States; and that the title of the navigable waters, and the soil beneath them, was in the state, and subject to its sovereignty and jurisdiction. In Genesee Chief v. Fitzhugh, 12 How. 443 [13 L. Ed. 1058], it was settled that for purposes of admiralty jurisdiction the tidal test, prevailing in England for determining what is navigable water, is not applicable to this country. In Barney v. Keokuk, 94 U. S. 324, 338 [24 L. Ed. 224], it was held that it is for the states to establish for themselves such rules of property as they may deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent thereto."

The court then quotes the language above set forth from Barney v. Keokuk, supra, and adds:

"The doctrine thus enunciated has since been adhered to. Packer v. Bird, 137 U. S. 661, 669 [11 Sup. Ct. 210, 34 L. Ed. 819]; Hardin v. Jordan, 140 U. S. 371, 382 [11 Sup. Ct. 808, 838, 35 L. Ed. 428]; Shively v. Bowlby, 152 U. S. 1, 40, 58 [14 Sup. Ct. 548, 38 L. Ed. 331]; Water Power Co. v. Water Commissioners, 168 U. S. 349, 358 [18 Sup. Ct. 157, 42 L. Ed. 497]; Scott v. Lattig, 227 U. S. 229, 243 [33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107]. The question of the navigability in fact of nontidal streams is sometimes a doubtful one. It has been held in effect that what are navigable waters of the United States, within the meaning of the act of Congress, in contradistinction to the navigable waters of the states, depends upon whether the stream in its ordinary condition affords a channel for useful commerce. The Montello, 20 Wall. 430 [22 L. Ed. 391]; Leovy v. United States, 177 U. S. 621 [20 Sup. Ct. 797, 44 L. Ed. 914]; United States v. Rio Grande Dam Co., 174 U. S. 690, 698 [19 Sup. Ct. 770, 43 L. Ed. 1136]; South Carolina v. Georgia, 93 U. S. 4, 10 [23 L. Ed. 782]; The Robert W. Parsons, 191 U. S. 17, 28 [24 Sup. Ct. 8, 48 L. Ed. 73]. But it results from the principles already referred to that what shall be deemed a navigable water within the meaning of the local rules of property is for the determination of the several states. Thus, the state of California, if she sees fit, may confer upon the riparian owners the title to the bed of any navigable stream within her borders."

In the case of Scott v. Lattig, supra, decided February 3, 1913, it was said:

"Coming to the effect to be given to the admission of Idaho as a state and to the disposal of the fractional subdivisions on the east bank, it is well to repeat that Snake river is a navigable stream, for there is an important difference between navigable and nonnavigable waters in such a connection. Thus, Rev. Stat. § 2476, which is but a continuation of early statutes on the subject (Act May 18, 1796, 1 Stat. 464, c. 29, p. 9; Act March 3, 1803, 2 Stat. 229, c. 27, p. 17), declares: 'All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become com-

mon to both.' And of this provision it was said in Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]: 'The court does not hesitate to decide that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be, and remain public highways.' Besides, it was settled long ago by this court, upon a consideration of the relative rights and powers of the federal and state governments under the Constitution, that lands underlying navigable waters within the several states belong to the respective states in virtue of their sovereignty and may be used and disposed of as they may direct, subject always to the rights of the public in such waters and to the paramount power of Congress to control their navigation so far as may be necessary for the regulation of commerce among the States and with foreign nations, and that each new state, upon its admission to the Union, becomes endowed with the same rights and powers in this regard as the older ones. County of St. Clair v. Livingston, 23 Wall. 46, 68 [23 L. Ed. 59]; Barney v. Keokuk, 94 U. S. 324, 338 [24 L. Ed. 224]; Illinois Central Railroad Co. v. Illinois, 146 U. S. 387, 434–437 [13 Sup. Ct. 110, 36 L. Ed. 1018]; Shively v. Bowlby, 152 U. S. 1, 48–50, 58 [14 Sup. Ct. 548, 38 L. Ed. 331]; McGilvra v. Ross, 215 U. S. 70 [30 Sup. Ct. 27, 54 L. Ed. 95]. Bearing in mind, then, that Snake river is a navigable stream, it is apparent: First, that on the admission of Idaho to statehood the ownership of the bed of the river on the Idaho side of the thread of the stream—the thread being the true boundary of the state—passed from the United States to the state, subject to the limitations just indicated; and, second, that the subsequent disposal by the former of the fractional subdivisions on the east bank carried with it no right to the bed of the river, save as the law of Idaho may have attached such a right to private riparian ownership. This is illustrated by the statement in Hardin v. Shedd, 190 U. S. 508, 519 [23 Sup. Ct. 685 (47 L. Ed. 1156)]: 'When land is conveyed by the United States bounded on a nonnavigable lake belonging to it, the grounds for the decision must be quite different from the considerations affecting a conveyance of land bounded on navigable water. In the latter case the land under the water does not belong to the United States, but has passed to the state by its admission to the Union. * * * When land under navigable water passes to the riparian proprietor, along with the grant of the shore by the United States, it does not pass by force of the grant alone, because the United States does not own it, but it passes by force of the declaration of the state which does own it that it is attached to the shore.' United States v. Chandler-Dunbar Co., 209 U. S. 447, 451 [28 Sup. Ct. 579, 52 L. Ed. 881], is to the same effect."

In Shively v. Bowlby, supra, it is held, however, that before statehood Congress has power to grant lands in the beds of navigable streams below high-water mark, for certain purposes, as the United States has the entire dominion and sovereignty, national and municipal, federal and state, over the territories so long as they are territories. On this subject the court said:

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States holds the territory.

"But Congress has never undertaken by general laws to dispose of such lands. And the reasons are not far to seek. As has been seen, by the law of England, the title in fee, or jus privatum, of the king or his grantee, was, in the phrase of Lord Hale, 'charged with and subject to that jus publicum which belongs to the king's subjects,' or, as he elsewhere puts it, 'is clothed and superinduced with a jus publicum, wherein both natives and foreigners

in peace with this kingdom are interested by reason of common commerce, trade, and intercourse.' Hargraves Law Tracts, 36, 84. In the words of Chief Justice Taney, 'country' discovered and settled by Englishmen 'was held by the king in his public and regal character as the representative of the nation, and in trust for them;' and the title and the dominion of the tidewaters and of the soil under them, in each colony, passed by the royal character to the grantees as 'a trust for the common use of the new community about to be established'; and, upon the American Revolution, vested absolutely in the people of each state 'for their own common use, subject only to the rights since surrendered by the Constitution to the general government.' Martin v. Waddell, 16 Pet. 367, 409–411 [10 L. Ed. 997]. As observed by Mr. Justice Curtis, 'This soil is held by the state, not only subject to, but in some sense in trust for, the enjoyment of certain public rights.' Smith v. Maryland, 18 How. 71, 74 [15 L. Ed. 269]. The title to the shore and lands under tidewater, said Mr. Justice Bradley, 'is regarded as incidental to the sovereignty of the state—a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery.' Hardin v. Jordan, 140 U. S. 371, 381 [11 Sup. Ct. 808, 838, 35 L. Ed. 428]. And the territories acquired by Congress, whether by deed of cession from the original states, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the Union as states, upon an equal footing with the original states in all respects; and the title and dominion of the tidewaters and the lands under them are held by by the United States for the benefit of the whole people, and, as this court has often said, in cases above cited, 'in trust for the future states.' Pollard v. Hagan, 3 How. 212, 221, 222 [11 L. Ed. 565]; Weber v. Harbor Com'rs, 18 Wall. 57, 65 [21 L. Ed. 798]; Knight v. United States Land Ass'n, 142 U. S. 161, 183 [12 Sup. Ct. 258, 35 L. Ed. 974].

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soil under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation, and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future states, and shall vest in the several states, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older states in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state, after it shall have become a completely organized community."

In the Pollard-Hagan Case, supra, it is said:

"This right of eminent domain over the shores and the soils under the navigable waters, for all municipal purposes, belongs exclusively to the states within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers."

In the light of the foregoing authority, can the grant to the Creek Nation of the land comprised within the boundaries covered by the patent be construed as conveying to the tribe not alone the uplands but also the bed between high-water marks of so much of the Arkansas

214 F.—10

river as falls within such boundaries? The granting clause of the patent is as follows:

"Now know ye, that the United States of America, in consideration of the premises and in conformity with the above recited provisions of the treaty aforesaid, have given and granted and by these presents do give and grant unto the said Muskogee or Creek tribe of Indians the tract of country above described, to have and to hold the same unto the said tribe of Indians so long as they shall exist as a Nation and continue to occupy the country hereby conveyed to them."

It is familiar history that the purpose of this grant to the Creeks was to provide them a country west of the Mississippi, to be taken and occupied by them in lieu of the lands formerly occupied by them, which they could no longer occupy in peace because of the encroachments of white settlers, and the friction incident thereto. It was to provide a home for this tribe in the then far West, where as it then appeared they might live unmolested for many years to come. They acquired by the grant a right of occupancy of the tract as a tribal home so long as they should exist as a tribe and continue to occupy it. But this was performing no international obligation, nor was it to effect the improvement of such land for the promotion and convenience of commerce. Can it be said that it was to carry out any other public purpose appropriate to the objects for which the United States held the public lands within the territories? We have seen that the purpose and object for which this land was originally acquired by the United States was that, as soon as the population and conditions should justify, it should be admitted into the Union as a state or states on an equal footing with the original states in all respects. This grant to the Creek Nation of the right of occupancy in the meantime is not inconsistent with the continuance of this ultimate purpose and object of statehood, which has now been accomplished. The Arkansas river, as a navigable stream, was as much a public highway through the tract granted after the grant as it was before. We have seen that, while Congress in disposing of the public lands in the territories has granted the lands above high-water mark to actual occupants to encourage the settlement of the country, a policy entirely consistent with the purpose for which the lands were held, that of comprising future states, it has invariably retained the beds of the navigable streams traversing such lands during the territorial period, so that the title thereto may vest in the state when admitted. As the Supreme Court has said, the public authorities ought to have entire control of the great passageways of commerce and navigation to be exercised for the public advantage and convenience. To so construe the grant to the Creek Nation as to give it ownership and control of the bed of this navigable stream would be a violent departure from the well-defined policy of the United States as to such stream. It would be carrying out no public purpose appropriate to the object for which these lands were originally acquired and held by the United States, that of ultimate statehood. To construe the grant as not conveying the bed of this river interferes with no object or purpose of the grant, that of providing a home for the tribe during its tribal existence, and occupancy of the land.

If, as is now settled, the United States held the bed of this navigable stream in trust for the future state, it is very doubtful whether Congress has the power to provide for a grant thereof to the tribe for a purpose other than those above mentioned as being within its power. By recent familiar legislation Congress has provided for the eventual dissolution of this tribe, and the division of a large portion of its lands among the members, and the sale of the surplus, so as to dispose of all tribal lands. In order to accomplish this, it was necessary to survey and subdivide the tract in like manner as public lands are divided. By Act of Congress of April 7, 1864, c. 48, R. S. § 2115, it is provided:

"Whenever it becomes necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the general land office, and as nearly as may be in conformity to the rules and regulations under which other public lands are surveyed."

It is significant that when Congress came to make this survey the Arkansas river was treated as a navigable stream and meandered, not being included within the survey. This is a construction of the grant by the officers of the government consistent with the conception that it was never intended that the bed of the stream should pass to the tribe, but was reserved and continued to be held in trust for the future state. I conclude that the Creek Nation by virtue of its patent acquired no right or title to the bed of the Arkansas river between high-water marks, but that the same continued to be held by the United States in trust for the future state until the advent of statehood November 16, 1907, when it vested in the state of Oklahoma, subject to whatever rights if any the local state law, statutory or common, gave to owners of land bordering on the stream.

III. The finding that the Creek Nation never acquired any title to the bed of the river eliminates from further consideration the third question.

[4] IV. What, if any, rights accrued to Louisa Mackey, or her heirs, in the bed of the stream below high-water mark, by virtue of the ownership of the upland bordering upon the stream?

By the patent covering the tract of which one boundary was the river, the allottee took not merely to the meander line, but to the high-water mark of the stream.

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the bank of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line, as actually run on the land, is the boundary." St. Paul R. Co. v. Schurmeier, 7 Wall. 272, 19 L. Ed. 74.

The actual line marking the boundary is ordinary high-water mark of the stream. Shively v. Bowlby, supra. In the patents issued for fractional tracts of the public lands bordering upon navigable stream, the government only undertakes to convey the upland exclusive of the bed of the stream below such high-water mark, but the grant from the government extends not only to the meander line, but to actual high-

water mark. So, here, the patent from the Creek Nation is intended to convey whatever interest that nation has in the land. We have seen that its interest only extends to high-water mark; but to that extent the allottee takes by virtue of the patent.

In Packer v. Bird, 137 U. S. at page 669, 11 Sup. Ct. at page 212, 34 L. Ed. 819, it is said:

"The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. As an incident of such ownership, the right of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the state, either to low or high-water mark, or will extend to the middle of the stream."

[5] Since, then, the allottee's rights as a riparian owner must be determined by the law of the state, it becomes necessary to determine what that law is.

The Legislature of Oklahoma Territory, at its first session in 1890, adopted certain laws of the territory of Dakota, among which was the following:

"Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders upon a navigable lake or stream, takes to the edge of the lake or stream, at low-water mark, and all navigable rivers shall remain and be deemed public highways. In all cases where the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both." Stats. of 1890, § 4173, Snyder's Stats. 1909, § 7254.

This section seems never to have been repealed by subsequent territorial legislation, so that, if it had any force as a law when it was adopted, it had the same force in 1907 when Oklahoma became a state. By section 2 of the Schedule of the state Constitution it is provided:

"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."

It is contended, however, that the territorial Legislature had no power to so legislate with regard to rights of the owners of lands within the territory bordering on navigable streams. The territorial legislative authority is found in section 6 of the Organic Act of the Territory, which reads:

"That the legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil."

If this was a rightful subject of legislation, not inconsistent with the Constitution and laws of the United States, then it was valid when adopted, and remained in force as a valid law, and became the law of the state by virtue of the constitutional provision above quoted. If, on the other hand, it was not within the province of a rightful subject

of legislation, or was inconsistent with the Constitution and laws of the United States, it was not in force as a law of Oklahoma Territory when statehood intervened, and did not come within the adopting provision of the state Constitution. State v. Chaney, 23 Okl. 788, 102 Pac. 133. It will be noted that the evident purpose of the act is not merely to provide for some temporary right in the riparian owner to use the land only during the territorial period, but attempts to fix by law the extent of land which he shall take under his grant. No case is cited by counsel, nor do I find any, in which the precise question involved is decided; that is, as to the validity of such a territorial statute. But on principle, in the light of the decisions of the Supreme Court of the United States, I am convinced that the defining of the rights of riparian owners in the beds of navigable streams is not a rightful subject of territorial legislation. The United States has the entire dominion and sovereignty, national and municipal, federal and state, over all the territories, so long as they remain in a territorial condition. Shively v. Bowlby, supra. The territorial Legislature is but the creature of Congress, and can have no greater power of legislation than Congress. In Shively v. Bowlby, supra, the law is thus concisely stated:

"The new states admitted into the Union since the adoption of the Constitution have the same rights as the original states in the tidewaters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution. The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union. Grants by Congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created, but leave the question of the use of the shores by the owners of uplands to the sovereign control of each state, subject only to the rights vested by the Constitution in the United States."

It cannot therefore be reasonably urged that when Congress gave to the Legislature of Oklahoma Territory, by the organic act, power to legislate upon all rightful subjects of legislation, it intended to clothe it with power to pass a law amounting to a grant to riparian owners of so much of the bed of navigable streams as might lie between high and low water mark, in front of the lands they held under patents from the Government. If, as said by the Supreme Court, Congress has always pursued the policy of leaving the disposition of the soil under the navigable waters to the control of the states when organized and admitted into the Union, it cannot be that that would be a rightful subject of legislation which would enable a territorial Legislature to violate this established policy. I cannot escape the conclusion that this territorial statute was void, and, being void, did not become a law

of the state by the adopting provision of the Constitution above quoted.

This provision of the territorial law of 1890 was copied into Snyder's Compiled Law of Oklahoma of 1909, but the provisions of law under which this compilation was made are not such as to lend any validity to the section as a law of the state, if, as I have concluded, it had no validity as a territorial law.

Since these demurrers were argued and submitted, the Revised Laws of Oklahoma, 1910, have been published and have taken effect, but not until after the Legislature at its last regular session had provided that section 6639 thereof, which carried into these laws this provision of the territorial Legislature, should not be adopted as a part of the said revised laws. In the act, approved March 22, 1913 (Laws 1913, c. 75), adopting the Revised Laws of 1910, it is provided:

"* * * That section 6639 of the Revised Laws, being a provision defining the rights of the owners of land abutting upon navigable waters, shall not be adopted or become a part of said revised laws under the provisions of this act; provided, further, that this act shall not be construed to alter, change, impair, disparage, vest or divest any right or interest of the United States government, the State of Oklahoma, any of the Five Civilized Tribes of Indians or nation, or any riparian, or abutting owner of any of the river beds, or streams, of the state of Oklahoma, or to change any interest, or ownership of the sand, gravel, oil, gas, or other mineral substance, or product, which may now exist, or which may hereafter be discovered in or under such river beds or streams."

[6] There being no state statute settling this question, it must be determined by the common law as adopted by the state of Oklahoma when it was admitted into the Union. By enactment of the territorial Legislature, prior to statehood, in force at the time of admission, it was provided that:

"The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma." Wilson's Statutes of Oklahoma 1903, § 4200.

We have seen that by section 2 of the Schedule of the state Constitution this became the law of the new state. The common law as thus adopted, so far as the question now under consideration is concerned, has not been modified by any constitutional or statutory law of the state, nor does it appear that this question has ever been determined by the Supreme Court of the state. It is therefore one of first impression here, so far as controlling decisions are concerned, and depends solely upon the construction of the common law as it now exists in Oklahoma, as applied to the admitted facts. The Arkansas river at the point in controversy is not affected by the ebb and flow of the tide. If therefore we are to apply the strict rule of the common law as it existed in England at the time this country was colonized, the rights of the owners of the upland bordering upon this stream, so far as ownership of the soil is concerned, must be considered as extending to the middle thread of the stream, to the exclusion of the state, subject only to the public right of navigation. Shively v. Bowlby, supra. There being no constitutional or statutory law or judicial decisions of Oklahoma modifying this feature of the common law, it only remains to

determine whether, in view of the condition and wants of the people of the state, this original doctrine of the common law, as it prevailed in England, must be considered as modified by such condition and wants, and, if so, to what extent.

[7] The statute above quoted, adopting the common law, was borrowed from Kansas. In 1882 the question of the rights of a riparian owner upon a navigable stream in the bed of the river below high-water mark came before the Supreme Court of that state in the case of Wood v. Fowler, 26 Kan. 682, 40 Am. Rep. 330, and in a well-considered opinion by Justice Brewer, then on the supreme bench of that state, it was held that a riparian owner owns only to the bank and not to the center of a navigable stream. Speaking of the Kansas river in that state, which the court finds to be a navigable stream, he says:

"The stream having been meandered, the lines of the surveys are bounded by the bank; the patents from the United States passed title only to the bank; Spitlog, as riparian owner, owned only to the bank. The title to the bed of the stream is in the state. Stevens v. Bld. Co., 34 N. J. Law, 532 [3 Am. Rep. 269]; Pollard's Lessee v. Hagan, 3 How. U. S. 212 [11 L. Ed. 565]. It is true a distinction was recognized in England, and that streams were considered navigable only in so far as they partook of the sea, and to the extent that their waters were affected by the ebb and flow of the tide, and only so far was the title of the riparian owner limited to the bank. Above such point, even although the stream was large enough to be used, and in fact was used, for purposes of navigation, the riparian owner owned the soil ad medium filum aquæ. So that really there were three distinct characters of streams recognized: First, those smaller streams, which could not be used for any purpose of navigation, in which the title to the soil was in the riparian owner, and along which the public had no rights of highway or otherwise; an intermediate class, in which the riparian owner owned to the middle of the channel, but along whose stream the public had all the rights of a highway; and, third, that which was called technically the navigable streams, where the title to the bed of the stream was in the sovereign, and all rights were in the public. The same doctrine of riparian ownership to the center of the stream in rivers unaffected by the ebb and flow of the tide is recognized in some states of the Union; but the better and more generally accepted rule in this country is to apply the term 'navigable' to all the streams which are in fact navigable, and in such case to limit the title of the riparian owner to the bank of the stream. Especially is this true in the states where the lands have been surveyed and patented under the federal law. See the following authorities: Rld. Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]; McManus v. Carmichael, 3 Iowa, 1; Haight v. Keokuk, 4 Iowa, 199; Tomlin v. Rld. Co., 32 Iowa, 106 [7 Am. Rep. 176]; Flanagan v. City of Philadelphia, 42 Pa. 219; Bridge Co. v. Kirk, 46 Pa. 112 [84 Am. Dec. 527]; People v. Tibbets, 19 N. Y. 523; People v. Canal Appraisers, 33 N. Y. 461."

The Iowa case, McManus v. Carmichael, supra, cited by Justice Brewer, presents an exhaustive discussion of this matter by Justice Woodward of the Iowa Supreme Court, reviewing most if not all the conflicting state decisions on the subject up to that time, and in concluding he says:

"This large portion of attention has been given to the subject, from a conviction that the common-law rule is not applicable to the Mississippi river, and because the subject has not been discussed as it should be; the courts assuming the old rule, in many cases, sub silentio. By thus reviewing it, we trust that it is made manifest that less weight is to be given the old rule than the mind would, at first, suppose, and that the way has been opening for its entire rejection from the noble waters of the west."

In Arkansas the "common law of England, so far as the same is applicable, and of a general nature," is made the rule of decision except as modified or repealed by statute. Mansfield's Digest, § 566. In 1890 the Supreme Court of that state had before it the question of the rights of riparian owners in the bed of the White river, a navigable stream within that state. The question arose in St. Louis, Iron Mountain & Southern Ry. Co. v. Ramsey, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195, and involved the taking of gravel from the bed of the stream by the railway company. It was there said:

"The main question to be determined is how far the ownership of the appellees in the land between the banks of the river, in front of their tract, extends, by virtue of their ownership of the land upon the bank of the river, under the patent from the government of the United States. At common law, 'as a general principle, the soil of ancient navigable rivers, where there is a flux and reflux of the sea, belongs to the crown, and that of other streams to the subject; that is, to the owners of the adjacent grounds, to each respectively, as far as the middle of the stream.' Wool. Waters, 44. The ebb and flow of the tide in a river was at common law the most usual test of its navigability, but was not a conclusive test. Id. 40. The soil under navigable streams, at common law, belonged to the king as parens patriæ, for the same reason that the waters did; that is, as a trust for the public use and benefit. Id. cc. 1, 2; Ang. Tidewaters, 19–87; Hale, De Jure Mar. in 6 Cow. 539; Chapman v. Kimball, 9 Conn. 38 [21 Am. Dec. 707]. Many of the states of the United States have held to the common-law test of the navigability of rivers, and to the doctrine that only those rivers are navigable, in a legal sense, in which the tide ebbs and flows; and there has been much discussion and conflict of authority upon this question, a majority in number, perhaps, of the courts of last resort maintaining the common-law doctrine. But the more reasonable test, as we conceive, of the navigability of a river, is its use as a navigable stream, or its capability of being used as such. The ebb and flow of the tide is merely an arbitrary test, since many waters where the tide flows are not in fact navigable, and many, especially on this continent, where it does not flow, are navigable. 'It is navigability in fact that forms the foundation for navigability in law.' McManus v. Carmichael, 3 Iowa, 1; The Genesse Chief v. Fitzhugh, 12 How. 443 [13 L. Ed. 1058]. While in England the ebb and flow of the tide is the most convenient, certain, and usual test of the navigability of rivers, as the tide in fact does ebb and flow in all the navigable rivers, it is wholly inapplicable in this country, where there are large fresh-water rivers, thousands of miles long, flowing almost across the entire continent, bearing upon their bosom the commerce of the outside world in part, as well as of the continent. The largest river in England, the Severn, is only about 300 miles, and the Thames is only about 200 miles, in length. If we apply the principle of the common law, that the soil under the navigable waters belongs to the sovereign for the benefit and use of the public, and are not governed by the common-law test of the navigability of streams, but by their navigability in fact, we are constrained to maintain that the true doctrine is that the beds of navigable rivers belong to the government, notwithstanding that the tide does not ebb and flow in them. * * * The owner of land on the margin of a navigable stream in this state, holding under a grant from the United States government, does not take ad medium filum aquæ, but to high-water mark, as limited and defined above, and the beds of all navigable rivers in the state belong to the state in trust for the use of the public."

In the case of Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224, the Iowa case of McManus v. Carmichael, supra, was referred to, and the decisions of the United States Supreme Court bearing upon this question reviewed; the court, by Justice Bradley, saying:

"The exhaustive examination of this question by the Supreme Court of Iowa, in 1856, in the case of McManus v. Carmichael, 3 Iowa, 1, really leaves nothing to be said."

And Justice Bradley adds that the application of the strict rule of the common law to the different conditions existing in this country—that is, with regard to the ownership of the soil in navigable waters above tidewater—is at variance with sound principles of public policy.

The condition and wants of the people of Oklahoma, so far as the rights of riparian owners upon navigable streams in the soil of the beds thereof are concerned, must be considered as identical with that of the people of the neighboring states of Kansas, on the one side, and Arkansas, on the other; in both of which the rights of the riparian owners are held only to extend to high-water mark, the title to the bed between high-water marks being in the state. This doctrine has the support of the best-considered opinions of the state Supreme Courts, and, as we have seen, has the approval of the Supreme Court of the United States. Louisa Mackey, by virtue of her patent from the Creek Nation and the United States covering lands bordering on the Arkansas river, acquired thereby no right in the bed of that stream below high-water mark; the title thereto being in the state of Oklahoma. Louisa Mackey by her patent acquired title on the river side of each fractional tract or lot conveyed to her, not only to the meander line, but to the actual high-water mark. By the lease to Eysenbach, under which the Gypsy and Gladys Belle Oil Companies claim, describing these fractional lots by number, as they are described in the patents, there was conveyed to the present holders and owners of the lease the right to occupy for oil and gas mining purposes, not only up to the meander line, but up to high-water mark of the river. East Omaha Land Co. v. Jeffries (C. C.) 40 Fed. 386. It follows that, while the fact may be that there was a strip of land lying between the actual high-water mark and the meander line as run upon the land, it passed as effectually to Eysenbach by virtue of his lease as the remainder of the land included within the boundaries of said lots, and hence the subsequent lease to Avery must be considered as subordinate to it.

Inasmuch as the tract of land in controversy is that lying between the meander line and the low-water mark of the stream, it will be seen that if, as is probably the case, the meander line is not identical with the high-water mark, but is landward from actual high-water mark, then, as to the strip of land between high-water mark and the meander line, the Gypsy Oil Company and those united in interest with it must be held to prevail.

The bill of the United States on behalf of the Creek Nation must be dismissed. But it does not necessarily follow that the cross-bill must be dismissed. It is true the case is left without such diversity of citizenship as is required in cases where diversity of citizenship is relied upon as ground of federal jurisdiction in the initial pleading. The jurisdiction of the court to determine the matters raised by the cross-bill does not depend upon the citizenship of the parties, but on the subject-matter of the litigation. The property is in the actual custody of

the court, and this draws to it the right to decide upon the conflicting claims to its ultimate possession and control. Morgan's Co. v. Texas Central Ry., 137 U. S. at page 201, 11 Sup. Ct. 61, 34 L. Ed. 625.

As the proof may develop that a portion of the land in controversy lies between the meander line and actual high-water mark, in which case the Gypsy Company and those united in interest with it would be entitled to the possession of that much of the same for oil and gas purposes, the cross-bill will not now be dismissed.

Assuming, as we must, so far as the present consideration is concerned, that the Pollard-Hagan Company has a valid lease from the state, it is entitled to prevail as to so much of said tract as is below actual high-water mark of the river.

Orders will be entered in accordance with this opinion.