UNITED STATES v. BREWER-ELLIOTT OIL & GAS CO. et al.

(District Court, W. D. Oklahoma.    February 21, 1918.)

No. 75.

1. NAVIGABLE WATERS ☜37(4)—INDIAN RESERVATIONS—NAVIGABLE STREAMS.
    In view of Act March 3, 1811, c. 46, § 12, 2 Stat. 666 (Comp. St. 1916, § 9846), declaring navigable waters in the former territory of Louisiana and Orleans to be public highways, and declarations in the Treaty with France, the Cherokee Nation when by patent dated December 31, 1838, it secured lands in the Louisiana Purchase territory on both sides of the Arkansas river, did not acquire title to the bed of the stream if it was navigable.

2. NAVIGABLE WATERS ☜37(4)—RESERVATIONS—TITLE TO NAVIGABLE STREAM.
    The Osage Indians having by treaty of September 29, 1865, 14 Stat. 687, and Act July 15, 1870, c. 296, 16 Stat. 362, and Treaty with the Cherokee Nation of July 19, 1866, 14 Stat. 799, and Act June 5, 1872, c. 310, 17 Stat. 228, been removed from their Kansas lands and given a reservation bounded by the Arkansas river in lands previously granted to the Cherokee Nation, did not acquire title to the bed of that stream if it was navigable; this conclusion being strengthened by the fact that the reservation was included in the territory of Oklahoma by Organic Act May 2, 1890, and it was provided in the Enabling Act, § 21, that the reservation should become an organized county.

3. NAVIGABLE WATERS ☜37(4)—DEEDS—CONSTRUCTION—LIMITATIONS.
    As the Osage Indians by Act June 5, 1872, acquired from the Cherokee Nation a reservation bounded by the main channel of the Arkansas river, a deed subsequently executed by the Nation, which described the reservation as bounded by the left bank of the river, did not limit any rights of the Osage Indians in the river already acquired.

4. DEEDS ☜112(2)—PLATS—INCORPORATION BY REFERENCE.
    Where a deed referred to a plat annexed thereto as illustrative of the lands conveyed, the plat is by reference incorporated in the instrument.

5. STATUTES ☜55—TERRITORIAL LEGISLATURE—SUBJECT OF LEGISLATION.
    St. Okl. 1890, § 4173, continued in Rev. Laws 1910, § 6639, in so far as it attempted to prescribe the rights of riparian owners on navigable streams, is invalid, being in excess of the power of the territorial Legislature as restricted by Organic Act May 2, 1890, § 6, which limited the power of the Legislature to matters not inconsistent with the federal Constitution and laws.

6. STATUTES ☜55—TERRITORIAL LEGISLATURE—AUTHORITY.
    In view of similar congressional legislation, St. Okl. 1890, § 4173, continued after statehood as Rev. Laws 1910, § 6639, in so far as it declared that the bed of nonnavigable streams shall belong to the opposite owners in common, is valid, being within the power of the territorial Legislature, as limited by Organic Act May 2, 1890, § 6.

7. WATERS AND WATER COURSES ☜89—NONNAVIGABLE STREAMS—RIGHT OF RIPARIAN OWNERS.
    At common law, a riparian owner took title to the middle of an adjacent nonnavigable stream.

8. WATERS AND WATER COURSES ☜89—RIPARIAN PROPRIETORS—RIGHTS OF.
    Minerals in the bed of the Arkansas river which bounded the Osage Reservation, under the Osage Allotment Act of June 28, 1906, belong to the tribe alone, if the river at that point is nonnavigable, so that title to the bed would pass to the riparian owners.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
    249 F.—39

9. NAVIGABLE WATERS ☞36(1)—STREAMS—AUTHORITY OF STATE.
   A state takes title to the bed of navigable streams in its borders, and, subject to the paramount authority of Congress to control navigation in the regulating of interstate and foreign commerce, may appropriate and dispose of minerals found in the beds of such streams.

10. NAVIGABLE WATERS ☞1(3)—NAVIGABILITY OF STREAM—TEST—"NAVIGABLE."
    The issue of the navigability of a stream is one of fact, and, when used or susceptible of use in its ordinary condition as a highway of trade and travel in the customary modes on water, a stream will be deemed "navigable."
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

11. COURTS ☞365—PRECEDENTS—FEDERAL COURTS.
    While recognizing the importance of harmony in judicial decisions, the federal courts on questions of general law are not bound by the decisions of the state courts, though leaning to agreement with the state courts if the question is doubtful.

12. EVIDENCE ☞10(5)—JUDICIAL NOTICE—NAVIGABILITY OF STREAM.
    While courts should take judicial notice that an important river is navigable, the point where navigability ceases, unless within general knowledge, requires proof, and the federal courts will not take judicial notice that the Arkansas river is navigable above the mouth of the Grand river.

13. NAVIGABLE WATERS ☞1(7)—EVIDENCE OF NAVIGABILITY—MEANDERING OF BANKS.
    That the banks of the Arkansas river above the mouth of the Grand river were meandered does not establish the navigability of the stream, but is mere evidence that it is navigable in view of the practice of public surveyors to meander the banks of navigable streams to define fractional areas of land.

14. NAVIGABLE WATERS ☞1(3)—CONGRESSIONAL APPROPRIATIONS—EFFECT.
    While congressional appropriations for the improvement of a river should be assigned weight in determining whether it is navigable, their force is not to declare a river navigable in its natural state, for the improvement might be intended to render it navigable.

15. EVIDENCE ☞48—JUDICIAL NOTICE—OFFICIAL STATEMENTS.
    The federal courts will take judicial notice of official statements of the heads of executive departments, such as the War Department.

16. NAVIGABLE WATERS ☞1(6)—NAVIGABILITY—EVIDENCE.
    The Arkansas river at a point above the mouth of the Grand river where it bounded the Osage Reservation *held* not navigable, so that title to the bed of the stream to the middle of the main channel passed to the tribe.

In Equity. Suit by the United States, as trustee for the Osage Tribe of Indians and for itself, against the Brewer-Elliott Oil & Gas Company and others, in which the State of Oklahoma intervened. On final hearing. Decree for complainant, and cause retained for further proceeding.

Francis J. Kearful, Asst. Atty. Gen., John A. Fain, U. S. Atty., of Lawton, Okl., and Isaac D. Taylor, of Oklahoma City, Okl., for plaintiff.

S. P. Freeling, Atty. Gen., and Ledbetter, Stuart & Bell, Burwell, Crockett & Johnson, and Blake & Boys, all of Oklahoma City, Okl., for defendants and interveners.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

COTTERAL, District Judge. This suit was brought by the United States, as trustee for the Osage Tribe of Indians and for itself, against several companies holding oil and gas leases from the state of Oklahoma of the bed of the Arkansas river, below high-water marks, near Cleveland, Okl., and located in sections 1, 12, and 13, range 7 east; sections 6, 7, 24, and 25, range 8 east; and section 30, range 9 east— all in township 21 north, in this district. A decree is sought canceling the leases, enjoining operations and obstructions under them, and quieting title to the premises.

As a basis for relief in behalf of the Indians, it is alleged in the bill that the title to the river bed, limited in this case to the middle of the main channel, with the underlying oil and gas claimed adversely by the defendants, was granted and conveyed to the tribe, as a part of the Osage Reservation, pursuant to law and treaty, regardless of the navigability of the river; and that, as the river was then and still is nonnavigable at the above locations, such tribal title also arose from the ownership of the adjacent lands. The further complaint that the derricks and structures maintained by the defendants constitute and should be abated as obstructions to navigation of the river, if navigable, has not been pressed, and is without merit. The suit stands therefore as prosecuted solely in the interest of the tribe.

The state of Oklahoma and the Commissioners of the State Land Office intervened in the suit. They deny title in the tribe, and claim that the river is and always was navigable, that the title to the bed below high-water marks was not subject to disposal by the United States, but was held in trust for the state, and that the state, on admission in 1907, by virtue of its sovereignty, became invested with the title and the right to make the leases, as was done, conformably to the state Constitution and laws. The lessees similarly plead their rights under the leases.

At the outset, upon stipulation of counsel, a receiver was appointed with authority to collect and preserve all royalties and bonuses arising from the production of oil and gas, under the terms of the leases and the regulations of the State Land Office, assisted by a supervisory committee, representing the conflicting interests. Later, the Gypsy Oil Company, a lessee of adjacent lands, was made a party defendant, because of controversy over a division line with the Scioto Oil Company, a defendant lessee, and the receivership was extended to the operation of its lease, but was later terminated upon adjustment between the parties, and operation was restored to the company. From an order construing that lease and directing the receiver as to the bonus payable from his funds by that lessee, an appeal has been allowed. Other orders have been passed in the course of the receivership, not essential to the controversy now before the court.

The case was tried and submitted at a full hearing; and counsel have presented their contentions in oral arguments and briefs, with a thoroughness and ability quite in keeping with the importance of the questions involved.

The main questions for decision are whether, before the inception of any claim of title by the state, there was an effective grant of title

to the tribe of the bed of the Arkansas river, even if navigable, and, if not, then whether the river is navigable or not, whereby the title to the disputed portion was vested in the state or the tribe.

The claim of an antecedent grant is rested on the supposed exercise of a power vested in Congress thus to carry out a public purpose for which the lands were held. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; United States v. Winans, 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089; McGilvra v. Ross, 215 U. S. 70, 30 Sup. Ct. 27, 54 L. Ed. 95.

[1] The Osage Reservation was purchased from the Cherokee Nation and was a part of the lands the Cherokees acquired out of the domain of the Louisiana Purchase, the object of which was expressed in the treaty with France to be the formation of new states. 8 Stat. 200, art. 3. That policy was not, however, adhered to in providing for the settlement of the Cherokees west of the Mississippi river. As the lands described in their patent of December 31, 1838, lie on both sides of the Arkansas river here involved, the first inquiry is, naturally, whether they had a title to the bed of the river, if navigable.

The treaties and acts affecting their title are reviewed in the case of Heckman v. United States, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820. The stipulations made in their favor that they were to be secured a permanent home, not embarrassed by state lines or jurisdiction, and a free and unmolested outlet on the west, and were authorized with limitations to make local laws concerning persons and property, did not exclude but implied the need of federal control over navigable streams, if any, in their country. It would remain not only consistent with the rights of the Indians, but important to their advancement, that any avenue of transportation be kept open for their benefit. A similar policy toward the Indians is found in the congressional grants for the construction of railroads through Indian Territory. And the Act of March 3, 1811 (Act March 3, 1811, c. 46, § 12, 2 Stat. 666 [Comp. St. 1916, § 9846]) still applied in providing that "all the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways." Conceding full force to the laws and treaties applicable, it is clear that the Cherokees had no title to any navigable stream in their country. As a result, they could convey none in any event to the bed of the Arkansas river, at the Osage boundary, if there navigable.

[2-4] The next question is with reference to the title acquired by the Osage Tribe. By treaty and law, provision was made for the sale of their lands in Kansas, payments to them, and their removal to Indian Territory. Treaty Sept. 29, 1865, 14 Stat. 687; Act July 15, 1870, c. 296, 16 Stat. 362. The Cherokees stipulated in the treaty of July 19, 1866 (14 Stat. 799), for the settlement of friendly Indians in their country west of the Ninety-Sixth Meridian, with terms of payment left to future agreement, etc. As the early settlements occurred east of that meridian, by the Act of June 5, 1872 (c. 310, 17 Stat. 228), selections west of it were confirmed as their reservation, within which they were to permit the settlement of the Kansas Tribe, which was to make payment from the proceeds of lands in Kansas, and the lower

boundary of the reservation was defined as the north line of the Creek Country and the main channel of the Arkansas river. The Act of March 3, 1873 (c. 228, 17 Stat. 538), provided for payment to the Cherokees out of the funds of the Osages for the lands purchased by them. By the Act of March 3, 1883 (c. 143, 22 Stat. 624), a further payment was appropriated out of funds due under appraisement of Cherokee lands west of the Arkansas river, and the Cherokee Nation was to execute conveyances satisfactory to the Secretary of the Interior to the United States in trust for the Pawnees, Poncas, Nez Perces, Otoes, and Missourias, and Osages "now occupying said tract, as they respectively occupy the same before payment of said sum of money."

A formal deed was executed on June 14, 1893, by the Cherokee Nation to the United States in trust for the Osage and Kansas Indians. Certain whole and fractional townships were described, and the latter as being on "the left bank of the Arkansas river," according to a plat annexed and made a part of the conveyance. It was also recited that a part of said lands had been set apart for the Kansas Indians, consisting of townships whole and fractional, then described and indicated on the plat.

On the plat is a note, reciting that all the islands opposite the lands described in the deed, except Beaver and Turkey, in township 23 north, range 3 east, conveyed of even date for the Otoe and Missouria Indians, are "a part and parcel of the lands set apart for the Osage and Kansas Indians, and are covered by and embraced in this plat and the foregoing deed of conveyance." In addition, an island, apparently illustrative, is shown as the west boundary of the Osage Reservation.

The deed did not limit the area of the Osage lands, as confirmed by the act of 1872. As it was but a fulfillment of treaty and law, the authority of the Secretary of the Interior was to require conformity with them. The designation of the river boundary as "the main channel" in the act and "the left bank" in the deed are therefore held equivalent. A sufficient reason for holding that there was no limitation by the deed is that the title was vested in the tribe by the act of 1872, without a deed. Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; Francis v. Francis, 203 U. S. 233, 27 Sup. Ct. 129, 51 L. Ed. 165; Chase v. United States, 222 Fed. 593, 138 C. C. A. 117.

The plat and note were effectively incorporated in the deed by reference. Cragin v. Powell, 128 U. S. 691, 9 Sup. Ct. 203, 32 L. Ed. 566; Jeffries v. East Omaha Land Co., 134 U. S. 178, 10 Sup. Ct. 518, 33 L. Ed. 872; Beach Front Hotel Co. v. Sooy, 197 Fed. 881, 118 C. C. A. 579. The authenticity of the note, which has been questioned, is presumed, as a part of the official records of the Indian Department, and it is confirmed by the letter of March 20, 1883, from the Commissioner to the Secretary of the Interior, in which he furnished descriptions for the deed, and stated that all the islands above the north boundary of the Creek Country, except Beaver and Turkey, belonged to the Osage and Kansas Tribes. But the inclusion of the islands in the deed can be relevant in this case only if it tends to throw light on the title to the bed of the river. Assuming that the deed in that

respect has a permissible bearing, the inference would be that the bed was not meant to be conveyed, although a resultant title would attach to it, as far as the middle of the main channel of the river, if it was not navigable.

No purpose is disclosed in the transactions relative to the Osage lands to invest them with such an extraordinary right as title to a navigable stream. The policy of the government has been to advance them speedily for the duties of state citizenship. As manifesting this, their reservation was by the Organic Act of May 2, 1890 (26 Stat. 81), included in the territory of Oklahoma, the initial step toward statehood in Indian Territory; and in the Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 277, § 21) it was provided that their reservation should become an organized county of the state.

The conclusion best sustained is that there was not any grant or conveyance to the Osages of title to the bed of the Arkansas river, if in fact navigable at the boundary of their reservation.

[5] A question arises whether title was vested in the tribe to a portion of the bed of the river by section 4173 of the laws of Oklahoma Territory, passed in 1890, appearing in section 6639 of the Revised Laws of 1910, and apparently continued in force by the Schedule of the state Constitution, providing in substance that, except where the grant indicates a different intent, riparian proprietors take to the edge of navigable streams and lakes at low-water mark, and the bed of those not navigable belong to the opposite owners in common. The adoption of that section into the Laws of 1910 was withdrawn as to owners of land on navigable waters, saving vested rights, by an Act approved March 22, 1913 (Sess. Laws, p. 117).

It was held by Judge Campbell, in the Mackey Case (D. C.) 214 Fed. 137, that, as the legislative power of the territory was limited by the Organic Act (section 6) to rightful subjects of legislation not inconsistent with the federal Constitution and laws, the provision as to lands on navigable streams was in excess of its power and invalid, and was not therefore adopted by the state. Further discussion is unnecessary, as the ruling is deemed to be sound, and to be concluded by the approval of the state Supreme Court, in State v. Nolegs, 40 Okl. 479, 139 Pac. 943.

[6, 7] No reason appears, however, for holding that the other provision of the section relating to lands on nonnavigable streams was not competent legislation or was not legally adopted by the state; and it is, accordingly, held to be valid from its enactment. Congress had long before declared to the same effect as to streams in the public lands. Section 2476, Rev. Stat. (Comp. St. 1916, § 4918). And by the common law, doubtless applicable in the absence of a statute, a riparian owner takes title to the middle of the adjacent stream. Railroad Co. v. Schurmeir, 7 Wall. 272, 19 L. Ed. 74; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107.

[8, 9] The remaining and all-important question is with respect to the character of the river at the locations of the leases, presented more broadly by the contention for the tribe that it is not navigable in this

state above the mouth of Grand river, and for the intervener and lessees that it is navigable throughout the state.

If the river is not navigable at these locations, then the tribe, as riparian proprietor, owns the bed to the middle of the main channel, and by the terms of the Osage allotment act of June 28, 1906 (c. 3572, 34 Stat. 539), the minerals therein belong solely to the tribe, and are subject to lease only for its benefit. But if the river is there navigable, then by the general rule invoked by the interveners and defendants, as broadened in this country and in force in Oklahoma, the title to the bed was held in trust for the state, and inured to it when admitted, on an equality with the others, subject to the paramount authority of Congress in the control of navigation to the end of regulating interstate and foreign commerce. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; The Genesee Chief, 12 How. 443, 13 L. Ed. 1058; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; McGilvra v. Ross, 215 U. S. 70, 30 Sup. Ct. 27, 54 L. Ed. 95; Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107; United States v. Cress, 243 U. S. 316, 37 Sup. Ct. 380, 61 L. Ed. 746. And the power of the state would then arise to appropriate and dispose of the oil and gas found in such lands, consistently with the above limitation. Weber v. State Harbor Com'rs, 18 Wall. (85 U. S.) 57, 21 L. Ed. 798; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Wood v. Fowler, 26 Kan. 682, 40 Am. Rep. 330; State v. Akers, 92 Kan. 169, 140 Pac. 637, Ann. Cas. 1916B, 543; State v. Nolegs, 40 Okl. 479, 139 Pac. 943.

[10] The issue of navigability is one of fact. The purely "legal test" cannot be accepted. A river is not navigable, unless so in fact. It will be deemed navigable, when used or susceptible of use, in its ordinary condition, as a highway of trade and travel in the customary modes on water. The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999; The Montello, 20 Wall. 441, 22 L. Ed. 391; United States v. Cress, 243 U. S. 316, 37 Sup. Ct. 380, 61 L. Ed. 746. The exceptional use of a a stream for purposes of transportation in times of temporary high water, or "the mere fact that logs, poles and rafts are floated down the stream occasionally * * * in * * * high water does not make it a navigable river." United States v. Rio Grande Irrigation Co., 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136. "To meet the test, * * * a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient." Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447.

[11, 12] This river has been the subject of decision in several cases. Dana v. Hurst, 86 Kan. 947, 122 Pac. 1041; United States v. Mackey (D. C.) 214 Fed. 137; Id., 216 Fed. 126, 132 C. C. A. 370; State v. Nolegs, 40 Okl. 479, 139 Pac. 943.

In the Dana-Hurst Case, where the title to an island near Hutchinson, Kan., was involved, and a trial was had to a jury as to present navigability of the river, the judgment was reversed, and the Supreme Court held the river to be there navigable, on the ground of former navigability, of which judicial notice was taken.

In United States v. Mackey (D. C.) 214 Fed. 137, the navigability of the river near Tulsa, Okl., was treated as practically conceded at the oral argument, and the decision in the Dana-Hurst Case was approved. The decree was reversed, with leave to answer, because rendered upon motions to dismiss, and without evidence, the Creek Nation being held to have sufficiently alleged ownership of the disputed premises, the agreement as to the facts not being of record, and a clear case for judicial notice not being warranted. 216 Fed. 126, 132 C. C. A. 370.

In State v. Nolegs, supra, the state had sued to quiet title to the bed of the river and an island, at the location here involved. The adverse·parties were adjacent landowners and grantees, and Nolegs, an · Osage Indian allottee of the island. A main question was whether the court would take judicial notice of the navigability of the river, in the sense of vesting title to the bed in the state. The Dana-Hurst Case and the Mackey Case in 214 Fed. 137, were cited and approved. In addition, reference was made to the Eleventh Census Report of 1890; to a letter dated in March, 1908, from the Commissioner of Indian affairs, approved by the head of the Interior Department, holding the river to be navigable through the Cherokee Nation, and that Nation not entitled to royalty for sand and gravel in the river bed after statehood, and conceding the title of the state to the beds of navigable streams in the Five Tribes; to the Act of February 17, 1897 (c. 238, 29 Stat. 531), authorizing a bridge near Cleveland, Okl.; to the Act of January 29, 1897 (c. 108, 29 Stat. 503), granting a franchise for a railroad through Indian and Oklahoma Territories; and to the Act of February 24, 1902 (c. 28, 32 Stat. 37), authorizing a bridge at Ft. Gibson. The river was held navigable in its entire course through the state, the title to the bed below high-water marks to be in the state, and the title to the island above those marks not in the state and to concern only the United States (not a party) and the allottee, and it was not determined.

Harmony in judicial decisions is recognized to be important, especially in the same state. But upon a question of general law, this court will exercise an independent judgment, although leaning to agreement with the state court, if the question presented is balanced in doubt. Sim v. Edenborn, 242 U. S. 131, 37 Sup. Ct. 36, 61 L. Ed. 199. In the case of United States v. Rio Grande Irrigation Co., 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136, involving the Rio Grande river (notably similar to the Arkansas river), it ·was held that, while the court should take judicial notice that an important river is navigable, the point where navigability ceases, unless it is or ought to be within general knowledge, requires proof, and upon the affidavits and other evidence the Rio Grande river was found not navigable in New Mexico. In the present case, giving to all matters within general knowl-

edge full weight, no sufficient reason is found to sustain a holding that the Arkansas river above the mouth of Grand river in this state is or ever has been navigable, as a matter of judicial notice; and the soundness of that view has been well demonstrated by proof.

In the Mackey Case, 216 Fed. 126, 132 C. C. A. 370, decided two years after the Dana-Hurst Case, and more than four months after the Nolegs Case, the court declined to hold the Arkansas river navigable near Tulsa, where the Creek Nation had alleged title to the bed, but sent the case back for answer, whereby the issue of navigability might be tried. The same view is shown in Producers' Oil Co. v. United States, 245 Fed. 651, —— C. C. A. ——, where the character of the Cimarron river was held subject to proof.

This court is therefore bound to hold that the issue as to the navigability of the Arkansas river is dependent upon proof in fact by evidence and other proper sources of information.

The case of Wear v. Kansas, 245 U. S. 154, 38 Sup. Ct. 55, 62 L. Ed. —— (November 26, 1917), is not authority to the contrary in holding that, "if a state court takes upon itself to know without evidence whether the principal river of the state is navigable at the capital of the state, we certainly cannot pronounce it error," that "in this aspect it is a question of state law," that "the fact is of a kind that should be established once for all, not perpetually retried," and that the state court had, in favor of its decision legislation, averments in pleading, former decisions of that court, and the assent of the Supreme Court. The Arkansas river is not so located, its navigability is not so aided by legislation, pleading, or decisions; and the Nolegs Case was decided during the pendency of the present litigation.

[13] The effect of meandering the Arkansas river, cited as supporting navigability, upon authorities, is overestimated. In navigable streams, it defines the sinuosities of the banks and the fractional areas of lands sold. Railroad v. Schurmeir, 7 Wall. 272, 19 L. Ed. 74; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428. The government surveyors may not thereby determine the title to adjacent lands. Iowa v. Rood, 187 U. S. 87, 23 Sup. Ct. 49, 47 L. Ed. 86. Such lines are not deemed of certain significance. Kean v. Calument Co., 190 U. S. 452, 23 Sup. Ct. 651, 47 L. Ed. 1134. The Land Department employs them to denote streams of more than three chains in width, but only under special instructions in the case of nonnavigable streams, and at times they have been run when not thus authorized. Hattie Fuhrer, 12 Land Dec. 556; James Smith, 18 Land Dec. 135. Doubtless all navigable streams are meandered, and the fact in this case should be taken merely as some evidence of navigability. Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447.

[14] Acts of Congress making appropriations for the improvement of the Arkansas river and bridge grants have been noticed as specially importing navigability. The former may be summarized as beginning in 1879, being available as far as Wichita up to 1894, in Arkansas and Indian Territory until 1899, then limited to Arkansas until 1912, and next generally to Arkansas and Oklahoma until 1916. It was shown that no expenditures were required above Grand river,

and all except the first were made below that point. In general, such acts should be assigned weight, in view of the power of legislative inquiry and judgment. But their force is not to declare a river navigable in its natural state (United States v. Cress, 243 U. S. 316, 37 Sup. Ct. 380, 61 L. Ed. 746), and none of these acts purport to do so. A project for river improvement may be to create navigability, or, however prudently formed, may be necessarily experimental, and result in practical abandonment at a given section. When these acts are considered together and in the light of the engineers' reports and the fact that improvement of consequence was withheld above Grand river, the inference is justified that the river was ultimately not deemed navigable at the upper locations in the state. The bridge grants, while implying a state of navigability, may be due to prior appropriation acts, the holding of the War Department, or precaution in a doubtful case. Instances are cited of grants for bridges upon the South Canadian river, said to be nonnavigable, at Noble, Lexington, and in Blaine county, in this state. Act July 16, 1894, c. 136, 28 Stat. 103; Act Aug. 4, 1894, c. 206, 28 Stat. 225; Act Feb. 8, 1895, c. 62, 28 Stat. 644. While the acts are proper for consideration, they are in any event inconclusive, and leave the fact of actual navigability quite open to proof.

The Interior Department has not held, as supposed, to the navigability of this river at the Osage boundary. On the contrary, with the exception of the approved letter of March 27, 1908, from the Indian office, its position was defined in a letter of the Secretary, dated April 20, 1915, to the Attorney General, to be as stated by the court in Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956:

"That the Arkansas river is not now and never was practically navigable beyond Ft. Gibson in the Indian Territory."

Explanation was given that the letter of the Indian office referred to the river in the Cherokee Nation only, and was erroneous, "being based on a misconception as to the facts and misinterpretation of the views of the Supreme Court as expressed in its decision in the case of Shively v. Bowlby (152 U. S. 1 [14 Sup. Ct. 548, 38 L. Ed. 331])," and "not in accord with the views of the Department as to the status of the bed of the Arkansas river, or as to the title thereto." It was added that when the Creek Nation acquired its lands on August 11, 1852, the river was considered not navigable therein, from a report of Col. Long, of the Corps of Topographical Engineers, partly embodied in the report of Col. Abert, transmitted on January 27, 1854, by the Secretary of War to the Senate, from which it appeared that the river is navigable only to the junction of the Verdigris and Neosho rivers, and that such navigability is potential rather than actual.

The War Department formerly took a different position. In a letter of October 11, 1911, quoted in another of May 16, 1914, Acting Secretary Oliver informed the Attorney General that the navigability of the river in Osage county, Okl., appeared from a report of the engineer authorities "within the purview of laws enacted by Congress for the preservation and protection of such waters and of decisions by the Supreme Court," as the Department had uniformly held. In a mem-

orandum of September 16, 1914, justification was given for the attitude of the Department. Extended correspondence resulted from efforts of the Attorney General to obtain evidence from the Department in the pending litigation, which was tendered as to records, etc., but declined as to witnesses, the President being appealed to meantime, whereby the views of the Department were elicited more fully and its duty pointed out, and later, after a reconsideration, opinions supporting its position were furnished by the Judge Advocate General (Crowder) and the Chief of Engineers (Kingman). Finally, on request for the detail of witnesses, P. R. Van Frank, Jr., of the Little Rock office, was directed to make examinations and give his testimony.

[15, 16] But the Department is now committed against that view. In the letters of November 24, 1916, responding to a request of the Attorney General for a revocation of the letter of October 11, 1911, the present Secretary stated that in his judgment the records of the Department show the head of navigation on the Arkansas river to be at the mouth of Grand river, and that the Arkansas river is not navigable above that point, although formal revocation was withheld as a course less orderly and less advisable from an administrative viewpoint. The objections urged to these letters, written after the trial of this case, and submitted on service of copies, are held not tenable, as judicial notice should be taken of them. Heath v. Wallace, 138 U. S. 573, 11 Sup. Ct. 380, 34 L. Ed. 1063.

The testimony of Gen. Crowder and Gen. Kingman identified the opinions furnished by them to the Secretary, and the latter gave his views in detail. The testimony of Maj. Kelly was to the effect that three bridge permits were granted from 1901 to 1912, at Ft. Gibson, Muskogee, and Tulsa, and that another was refused at Tulsa; and his views were given. These witnesses did not testify from personal knowledge of the river in Oklahoma. Their testimony tends to sustain and reflects the former holding of the War Department.

Valuable evidence is found in the reports of engineers in the War Department, chiefly printed in various executive documents. They cannot be given fully, or in respect of measurements and tests; but sufficient reference to them may be made to show their weight in the case.

From an account of Capt. Bell, as early as 1820, Ft. Gibson was noticed as situated at the head of navigation. It was said that the current of the river was much less rapid than that of the Platte, but the character of both, "in a considerable degree, corresponds in their widely spreading waters of but little depth, running over a bed of yielding sand." Prof. Papers, War Dept. No. 13. And in Long's expedition, the same year (Thwaites, 1905), the river was said to be navigable to the mouth of the Neosho, or Grand, a distance of about 600 miles. According to the report of Col. J. J. Abert, in 1854, the river was navigable only to the junction with the Neosho and Verdigris, and the report of Col. S. T. Abert, in 1870, it could not be navigated above its junction with the Verdigris.

In February, 1879, Maj. Suter reported from a hurried reconnoissance of an assistant that the river from Wichita to Ft. Smith had a navigable depth the first 70 miles of 6 inches and the remainder of 12 inches, with a channel much obstructed by snags. He was of opinion that by removing snags and constructing slight dams at Shoals—the extent of advisable work before general improvement—navigation would equal that between Little Rock and Ft. Smith. The next year, the chief of engineers reported little progress with a snagboat due to low water and late season, proposed a renewal of operations as beneficial to flatboat navigation, and recommended appropriations. In 1881, Engineer Curtis reported his efforts to examine and clear

the river from Wichita to Ft. Smith, under difficulties indicative of nonnavigable conditions.

The only other and the chief improvement entered upon above Grand river was in that year by Capt. Evins, with the snagboat Wichita, which was well equipped and drew 15 inches. In his experience covering seven months, under a plan of work up to Arkansas City and return, he was able only to reach Pawnee Agency Landing, about 75 miles below Arkansas City, and was detained from fall to spring in returning by low water, sand, and rock. In his letter to Capt. Handbury, in June, 1882, it was said from observations that a good channel depth of 3 feet could be made to Arkansas City. In the annual report for that year, concentration of the channel was indispensable above Grand river, a survey and study of conditions advisable, the improvement feasible, and the benefit to a productive section cited. The work, however, was never resumed on the upper portion of the river.

The report for 1883 refers to work between Ft. Smith and Ft. Gibson, and that for 1884 to the operations below Ft. Gibson, and to a survey in progress from Wichita to Tulsa. The report for 1885 states that the original plan of improvement was the removal of snags and trees and the contraction of the channel at Shoals; that the expenditure of $59,000 resulted in practical value to navigation; and that the river was in excellent navigable condition up to Ft. Gibson, but above that point a large outlay would be requisite to make it navigable, as shown by a survey. It was added that a steel steamer with a fleet of five steel barges, none drawing over 12 inches, had been put on the river from Arkansas City to Ft. Gibson, on which data were being secured, thought portending a revolution in navigating upper reaches of shallow rivers, that an enormous commerce awaited this southern outlet, that the notes were being worked up, and "a full report with plans and estimates will be submitted in time for the action of the next Congress."

In November, 1884, Engineer Burrows, reporting to Capt. Taber a survey of the river from Wichita to Grand river, stated that no portion was or had been considered navigable, and that the mouth of the Grand river was considered the head of navigation, commerce for 40 miles below being practically nil, adding that a small boat of light draft had made the trip from Little Rock to Arkansas City on the crest of a short rise, carrying no freight of consequence, and of no practical benefit in demonstrating navigability. His opinion was that the river could be made navigable by dams, dikes, and confined channels, ranging from 200 to 500 feet, in different sections. In transmitting that report, in 1886, Capt. Taber reported that a two-foot channel could be provided and "the river should be, for all purposes of law, rated as navigable to Wichita." He proposed plans for permanent improvements by placing wing dams on shoals, employing dikes to protect banks, cause deposits and contract the water, and by temporary snagboat work. He adverted to the arrival of a steel steamer and barges as making a change in conditions of the problem of improvements, quoting an article from the Globe Democrat which described a small towboat built for shallow waters and its departure for Arkansas City.

In March, 1888, a permanent board of engineers on improvement of the river from Wichita to the mouth of the Canadian river reported that the commerce over that section is and always has been practically nothing, estimated the cost by contraction works of a navigable depth of two feet at low water as exceeding their value, expressed grave doubts as to maintaining it, and designated movable dams or a canal as a proper means of obtaining steady navigation, if justifying the expense.

, In the annual report for 1890, Capt. Taber again refers to Wichita as the head of navigation on the river, and it is cited along with other cities in the valley demanding a river outlet to cheapen over a million tons of freight, etc. This report probably was the foundation for a similar account in the Eleventh Census Report, and it is practically repeated in the report of the same officer for 1891.

After the incumbency of Capt. Taber (1884 to 1893), the succeeding engineers point with certainty to the nonnavigability of the upper river in the state. In 1894, no navigation was reported above Webbers Falls. From

the report of Gen. Sibert for 1895, it appears that there was only one trip, by a small boat, to Ft. Gibson during the year. In 1898, the estimate for completing the project of improvement from Wichita to the mouth of the river was called "indefinite." The next year, the statistics showed no navigation above Little Rock.

A board of three engineers appointed by the President, pursuant to an act of Congress, to thoroughly examine the river, with a view to permanent improvement, reported in 1899 that the mouth of the Grand river had always been considered the head of navigation, that attempts at navigation above that point had been of rare occurrence and soon abandoned, and that the river between Wichita and the Grand is crossed by 19 fixed bridges and 2 fixed dams.

In 1902, with the exception of a trip by the Carrie Clyde from the mouth to Grand river, no navigation appeared above Shoal creek, 88 miles below Ft. Smith. In 1903, Ft. Gibson was named as the head of navigation, and the statistics showed no commerce above Webbers Falls, and in 1904 Ft. Gibson was noted as the head of steamboat navigation. And except in 1906, this was repeated in the reports for the next ten years.

In 1909, Maj. Walker reported upon the section between Tulsa and Grand river that the steep slope, low water, and shifting sands and gravel precluded improvement of worth for navigation purposes by regulation works, and submitted estimates only for locks and dams, but deemed it unworthy of improvement. He stated that the mouth of Grand river had always been considered as the head of navigation, and that his office (Little Rock) had no information of any commercial navigation above that point.

The reports were directly supplemented by the testimony of Gen. Sibert, Maj. Walker, P. R. Van Frank, Jr., and Capt. Evins.

Gen. Sibert was for 30 years an officer in the engineer corps, and from 1894 to 1898 had supervision at the Little Rock office over the Arkansas river. He observed and acquired data as to its character, and was assisted by Van Frank, a competent engineer. No record was recalled of commerce above Grand river, which was considered by the steamboat operators and accepted by practically all of the engineers as the head of navigation, although there was an account of one or two boats going above it. In addition to explaining by measurements and tests the difficulty and cost of regulating or "canalizing" the stream, he was of opinion that from the small amount of water, and the character of the channel, bed, and banks, the result in practical utility would not warrant improvement from Tulsa to Grand river. It was thought loose logs or rafts would ordinarily be landed on sand bars, and that the shifting channel and violent changes within rendered navigation impossible. In an elaborate report, with citation to authorities and data, to the chief of engineers in April, 1898, he said:

"No constant diminution of the water supply in the navigable part of the Arkansas river is shown by the records so far as I can see. Tradition and history seem to establish the fact that the navigable depth of the Arkansas river was as small at times prior to 1860 as it has been since. There is nothing in the records of the last 20 years to show that these periods of extreme low water are of more frequent occurrence since 1888 than in the ten years prior to 1888."

And "summing up the records and testimony," he could not state definitely that irrigation had decreased the navigable capacity of the river, although the length of the dry bed in the upper portion had increased and the periods were more frequent.

Maj. Walker, of the corps of engineers, long in service, had supervision at the Little Rock office of the Arkansas and other rivers, from 1908 to 1910. He gave the project as being for the improvement of the Arkansas river from Wichita to the mouth, with discretion in the War Department as to expenditure of the appropriations. Under the Act of March 3, 1909, he was directed to make an examination between Tulsa and Ft. Smith with a view to recommendation for improvement. He examined the office records, observed the river at Ft. Gibson, and examined it at Muskogee and Tulsa, aided by Van Frank, commended as fully capable for the work. His opinion was that

the river could be made navigable from Tulsa down, and that from the appropriation bills contemplating the improvement the river was presumed to be navigable from Wichita to the mouth.

The mouth of Grand river was regarded by him as the head of actual not potential navigation. No expenditures were considered above that point. He had no information as to commercial navigation above it, except from the report of Capt. Taber, containing the account of steamboat and barges. Various reports were referred to, and notwithstanding his own for 1909, approved by the board of engineers and the chief, he deemed the river was navigable above the Grand river, based on the feasibility of floating logs (of which or its commercial value, however, he had no personal knowledge), which he considered practical at the time from data in the Little Rock office as to the flow of water. He knew of no one more familiar with the subject than Van Frank. There was further reference to the estimates in his report of dams ranging in cost from $3,781,500 to $10,044,000, and annual maintenance ranging from $340,630 to $541,880, contemplating transportation by boats and barges. The witness was unable to answer whether the river could be made navigable to Wichita. A cause given for his recommendation against improvement was the effect of railroad facilities in decreasing river transportation.

P. R. Van Frank, Jr., was principal assistant in the Little Rock district since 1891, engaging in field work on the Arkansas, St. Francis, and White rivers until the fall of 1913, and afterward in the Little Rock office, which was established in 1881. His duties were the preparation of plans, supervision of examinations, approval of reports, and other work. He assisted in the report of Gen. Sibert in 1908 on the question of diminution of the Arkansas river by irrigation. In his opinion, there was no subsequent change. He took part in the examination of the river at points between Wichita and the mouth, and the compilation of the data for the report of engineers in 1899, and assisted by Engineer Parkin prepared the draft of the report by Maj. Walker in 1909, on the river from Tulsa to Ft. Smith. He defined the elements for determining the capacity of a stream as volume of flow, nature of the bed, general slope, and general nature of obstructions in the channel; and prior use of the stream was regarded as a self-evident index. From a special examination of the river, he gave the water flow of the Arkansas as practically the same at Tulsa and above the Verdigris, and showing an abrupt increase below the Grand river. He explained that it was not possible to make a channel of worth above that point by contraction works due to lack of water and to steep slope, but practical to "canalize" it; movable dams being preferable. His opinion was that above Muskogee a dependable two-foot channel could not be obtained, except in April or probably May or June. He also referred to boats operating in the lower river, one of them going 20 or 21 miles above Muskogee and not returning.

Capt. Evins began "steamboating" in 1852, and came to the Arkansas river in 1860. He built the Wichita, which was lighter than the other boats known to him, and reported to Capt. Handbury, at Little Rock. In going upstream, it was necessary to take advantage of rises, and resort to spars and a capstan, at sand bars. He was at Pawnee Agency Landing almost four months, on account of low water, returning with delays, on high water, and thereafter the boat was not used in that section, because not feasible. The water was about the same as in other late seasons. He made no further attempt to go above Ft. Gibson, and had no knowledge of business on the river, but heard of a couple of boats going up. The boats would stop at Grand river, which they ascended a couple of miles to Ft. Gibson. His estimate was that the Grand river furnishes four times the low-water flow in the Arkansas, as it is a clear stream, is narrower, and has a gravel and clay bed. Since familiarity with the Arkansas river in 1860, there has been no great change in the water volume, but it has constantly increased in width from erosion of banks, affording almost one-half less navigable water. He named the boats operating at lower portions. The Kansas Millers, afterward renamed the Cleveland, made one trip above, was taken over by the government, and used by him. The Mary D was run from Ft. Smith to Ft. Gibson.

The City of Muskogee also went above Ft. Smith. His report to the chief that a navigable depth of three feet could be had to Arkansas City was attributed to his clerk and was unauthorized and incorrect.

Charles H. Miller, another engineer of practical experience in river work, also gave his testimony. His acquaintance with the Arkansas river began in 1905. He examined it at Wichita and Oxford, Kan., in 1907, and from Cleveland to Tulsa in 1915, and was familiar with the reports and documents in evidence, from which he gave measurements and tests. He thought it not practicable to contract the channel above Grand river, so as to furnish a channel depth, that the feasibility of "canalization" was uncertain, that fixed dams were useless but movable dams possible, with dredging work, for maintenance of the channel in all seasons. He prepared a hydrograph of the river at Tulsa and Webbers Falls from gauge readings of the Weather Bureau, between 1905 and 1915, and at the latter place between 1904 and 1911. In his opinion, the river did not have a navigable capacity for trade and traffic in the customary modes above the mouth of Grand river, and could not be made useful for transportation of freight, and a canal could not be built in the river. Skiffs could be used at any time, but not naphtha launches. He disagreed with the engineering estimates of 1909 that the river could be made navigable between Ft. Smith and Tulsa by locks and dams, at a cost of over $10,000,000. He and Van Frank took part in an experiment with two boats in the river between Cleveland and Tulsa, meeting difficulty in finding the deep water, frequently landing on sand bars from which they had to pull the boats. At that time, when there were 10 or 15 times the ordinary low-water flow, a flatboat could have been taken over it carrying a couple of tons, if small enough to get through the channels.

There was further testimony of witnesses, who had resided at or near Little Rock, Muskogee, Tulsa, Cleveland, Arkansas City, Wichita, and other points. [The summary of testimony which follows is by direction of the judge omitted to reduce length of opinion.]

This river has certain known characteristics. It is 2,000 miles long, second in importance as a tributary of the Mississippi, an outlet for a great area, and it is navigable probably 600 miles from its mouth. But it has a winding course, broad channel, and a bed of sand which moves and lodges with the currents. There are accounts, not free of conflict with others, of its use to an extent for transportation in Kansas and south from Arkansas City. But whatever weight may be due to known facts or reputed matters, tending to show that the river is or ever was navigable in fact above the mouth of Grand river in this state, it is certainly overcome by explicit proof.

The prevailing and ultimate opinions of the engineers present a strong showing of expert evidence from an accurate source against the navigability of the river in fact at any time above that point. It is substantially confirmed by the pilots, boatmen, and others from observation and experience. The use of that portion of the river for transportation boats has been exceptional and necessarily on high water, was found impractical, and was abandoned. The rafting of logs or freight has been attended with difficulties precluding utility. There was no practical susceptibility to use as a highway of trade or travel. The legislation and public acts are deemed insufficient to make out navigability. The Departments of War and the Interior concur in a holding against it. To conclude upon the record and the relevant facts entitled to consideration that the Arkansas river is or ever has been navigable above Grand river in Oklahoma would be to sustain a theory against a fact.

By the tests given in controlling authority, but one finding is justified in this case, and that is that it is clearly established that such portion of the Arkansas river is not and has not been navigable, and hence that it is not and has not been navigable along the south boundary of the Osage Reservation and at the particular locations here in controversy.

Such finding will be made. It follows, as a matter of law, that the Osage Tribe acquired the title to the river bed to the middle of the main channel along the south boundary of its reservation, now Osage county, and at the locations in controversy, and thereby became and is the sole owner of the underlying oil, gas, and other minerals, and that the United States holds the title to such portion of the river bed and said minerals in trust for the tribe, subject to lease only for its benefit, and as provided by law, and that the defendant lessees and the interveners have no right, title, or interest in or to said portion of the river bed or the minerals therein.

A decree will be entered to that effect, and quieting the title of the tribe and the plaintiff, as its trustee, to said portion of the river bed and minerals, and further that the receiver be ordered to pay to the United States in trust for the tribe the net funds heretofore and hereafter realized by him from the oil and gas therefrom, and that the lessees and interveners be denied any portion of said funds and be perpetually enjoined from prospecting for or taking oil, gas, or other minerals from such portion of the river bed, and that the leases here in question to that extent be canceled and held for naught.

The cause will be retained for the purpose of settling and paying the costs and charges of the receivership and apportioning to the plaintiff for the tribe its interest in the funds of the receiver, and for the ascertainment of the rightful claimants and owners of the residue thereof, and the apportionment and payment to them of the same, and further for the purpose of taxing all costs herein, and the making of all proper future orders; and in the meantime, and during the pendency of any and all appeals in this cause, the receiver will be continued as heretofore directed, subject to future orders.